**[Cite as *State v. Boyce*, 2020-Ohio-3573.]**

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## CLARK COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| | : | Appellate Case No. 2018-CA-77 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2017-CR-761A |
| v. | : | |
| | : | (Criminal Appeal from |
| RAMON A. BOYCE | : |  Common Pleas Court) |
| | : | |
| Defendant-Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of July, 2020.

. . . . . . . . . . .

JOHN M. LINTZ, Atty. Reg. No. 0097715, Clark County Prosecutor's Office, Appellate Division, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
        Attorney for Plaintiff-Appellee

CRAIG M. JAQUITH, Atty. Reg. No. 0052997, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

**{¶ 1}** Ramon A. Boyce was found guilty after a jury trial in the Clark County Court of Common Pleas of one count of engaging in a pattern of corrupt activity (a felony of the first degree), 18 counts of burglary (one felony of the second degree and 17 felonies of the third degree), and six counts of receiving stolen property (three felonies of the fifth degree and three misdemeanors of the first degree). The trial court imposed consecutive sentences totaling 70 years in prison, ordered Boyce to pay restitution of $3,049.94, and ordered the forfeiture of Boyce's three vehicles.

**{¶ 2}** Boyce appeals from his convictions. He claims that (1) the trial court erred in denying his motion to suppress related to a traffic stop, (2) the trial court erred in allowing evidence under Evid.R. 404(B) at trial, (3) the trial court erred when it provided no limiting instruction prior to testimony about Boyce's prior burglary conviction and when it later did not give a proper limiting instruction about that testimony, and (4) his sentence is clearly and convincingly unsupported by the record. For the following reasons, the trial court's judgment will be vacated as to the conviction on Count 19, and the matter will be remanded for the limited purpose of filing an amended judgment entry. In all other respects, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

**{¶ 3}** Boyce's jury trial lasted 15 days, during which the State presented 85 witnesses and Boyce offered 12 witnesses. The pertinent facts underlying the present appeal are summarized as follows.[1]

---

[1] Boyce has not raised an assignment of error challenging the sufficiency of the State's evidence or claiming that his convictions were against the manifest weight of the evidence. (Boyce, who is represented by counsel on appeal, attempted to do so in a pro

**{¶ 4}** Boyce's relevant criminal behavior began in 2005. In Clark C.P. No. 05-CR-1114, Boyce was convicted of three counts of receiving stolen property, all fifth-degree felonies; Boyce had an accomplice for those offenses. In Clark C.P. No. 08-CR-363, Boyce was convicted of another charge of receiving stolen property, a fifth-degree felony; the stolen property was a television. Boyce was acquitted of other charges in that case.

**{¶ 5}** In Case No. 08-CR-612, Boyce was convicted of burglary, a third-degree felony, and receiving stolen property, a fifth-degree felony. These charges arose from the burglary of the home of Charles and Jade Parsons on North Limestone Street in Springfield. The Parsons' home was surrounded by woods and had a lengthy driveway with the mailboxes for the Parsons and their neighbors situated side-by-side on Limestone Street, a distance away from the houses. The Parsons' home had an alarm system.

**{¶ 6}** In early June 2008, Jade Parsons and her husband were out of town, and they asked a friend to get their mail and newspapers from the mailbox. Mrs. Parsons had left on Saturday morning, and the friend went to the home on Sunday. The friend noticed something wrong and called the police. Upon her return, Mrs. Parsons noticed that every drawer was open and the house had been "ransacked." The cable, telephone, and alarm system lines had been cut. Jewelry was missing from upstairs, but Mrs. Parsons's costume jewelry was not taken. The couple's safe in the basement had been pried and drilled open with the Parsons' tools. The safe had contained some gold coins, cash, guns, and jewelry. Over time, Mrs. Parsons discovered that additional items were

---

se brief, but we denied his motion for leave to file a pro se brief.) Accordingly, our summary of the facts is not an exhaustive recitation of the evidence at trial, and it provides an overview of the State's evidence only.

missing.

{¶ 7} Mail addressed to the Parsons and their neighbors was collected in a wooded area approximately 250 feet south of the main driveway of the Parsons' home. Boyce's fingerprints were found on the mail. On June 4, 2008, Boyce sold jewelry taken from the burglary at Quick Cash Pawn, Inc., in Greendale, Indiana. Investigators later asked Mrs. Parsons to go to a pawnshop in Indiana to look at some property; Mrs. Parsons identified three or four items as hers. Boyce was convicted of the burglary of the Parsons' home and sentenced to prison.

{¶ 8} While incarcerated, Boyce met and befriended Chris Burkhart. Burkhart testified that Boyce identified himself as "a master thief," who knew how to break into safes and get around alarm systems. Boyce told Burkhart that he (Boyce) made a lot of money from burglaries, and the two agreed "to go 50/50 on everything that we did once we were out."

{¶ 9} Boyce was released from prison on January 27, 2016, and went to stay at a Volunteers of America halfway house. On March 10, Boyce was placed on an electronic monitor. Boyce returned to the Volunteers of America facility on March 28, and his monitor was removed. In April 2016, the home of Kristy and Steven McCready on Bexley Avenue was burglarized. Boyce entered through a bedroom window and stole jewelry, silver flatware, and watches. On May 6, Boyce was taken into custody for violating certain terms of his release, and he returned to prison, where he remained until the completion of his sentence on July 24, 2016.

{¶ 10} Soon after Boyce's release from prison, Boyce entered the homes of Tamara Compton (July 31-August 1) and of Donna and Steven Field (between August 21

and 25), who lived on Roscommon Drive.   Jewelry and cash were stolen.   In September 2016, the home of Tracy and Kevin Cochran on Signal Hill Road was burglarized; Boyce took a television and jewelry, as well as an SD card with a homemade personal video. Each of the homes' occupants was out of town when the burglaries occurred.

{¶ 11} Three burglaries occurred in November 2016: the homes of Ross McGregor & Cathy Crompton on Burrwood Drive, Nancy McGregor on Signal Hill Road, and Joy and David Galluch on Kilkenny Court.   Ross McGregor testified that the burglar took jewelry, watches, silver flatware, and a .22 caliber gun.   Nancy McGregor (Ross's aunt) testified that the burglar took many pieces of high-end jewelry valued over $10,000, a Kruggerand necklace; her husband's coin collection, a family heirloom ring valued at $20,972, and cash.   Joy Galluch indicated that a sorority charm, wedding band, engagement ring, and flatware were stolen.   Again, the residents were on vacation when the burglaries occurred; in each case, Boyce entered through a window.

{¶ 12} On November 30, 2016, Burkhart was released to a halfway house in Dayton; Burkhart still planned to work with Boyce.   Boyce visited Burkhart at the halfway house, and Burkhart met with Boyce when he received two weekend passes away from the halfway house, during which Burkhart was not monitored.   Burkhart testified that Boyce did not have a legitimate job, but he (Burkhart) received a gift from Boyce of $400 and other items.

{¶ 13} At the end of the December 2016, the home of Claire Perks was burglarized while Perks was on vacation in Alabama.   Sometime between December 30, 2016 and April 2017, while Donna and Richard Dolbeer wintered in Florida, Boyce entered their home on Longford Close through a bedroom window and took jewelry, a coin collection,

a camera, and $2,000 in cash; Boyce broke into a safe in a guest bedroom.

{¶ 14} During the weekend of February 3, 2017, while Burkhart had a weekend pass from the halfway house, Boyce and Burkhart broke into the home of Kay and Jerry Shell on Roscommon together. Burkhart testified that Boyce referred to it as "going to work." Boyce drove Burkhart to a wooded residential area, parked by a Kroger, put on gloves and a mask, and walked past a home with a privacy fence, through the golf course, and to the back of the Prestwick Village community. Boyce checked the mailboxes of residences along the way. While walking, Boyce pointed out a home where he had broken in and opened a safe.

{¶ 15} Burkhart and Boyce first removed a floodlight on the Shells' house and then entered the home through a window; Boyce gave Burkhart a laundry basket to stand on so he could get through. Boyce indicated to Burkhart that certain jewelry was costume jewelry; it was left behind. Boyce searched another part of the house while Burkhart searched a bedroom and bathroom. Boyce instructed Burkhart to leave everything as it was so the homeowners would not know that they had been there.

{¶ 16} The Shells had a small terrier, and they had a house/dog-sitter staying in the home while they were away. The house-sitter woke during the early morning of February 4 and noticed things off in the house, including that the dog was in her bedroom, where the dog was not allowed. Burkhart testified that he heard a dog bark in the house. Burkhart and Boyce left the Shells' home after Boyce came back to the master bedroom and told Burkhart, "We gotta get out of here." Burkhart testified that Boyce later paid him $400 for his participation in the burglary.

{¶ 17} Burkhart was released from the halfway house on February 6, 2017, and

was placed on an electronic ankle monitor. He did not participate in any criminal activities with Boyce while monitored. Burkhart testified that Boyce once came to visit him and showed him $20,000 that he (Boyce) had won at a casino.

{¶ 18} Shortly before February 8, 2017, the home of Teresa and Donald Miller on Signal Hill Road was burglarized while the Millers were in Florida. Prior to leaving, the Millers had placed all of their valuables, including diamond rings and necklaces, silverware, and gold jewelry, in a safe in the front hall closet. The safe was blown out and all of the valuables taken.

{¶ 19} At trial, Donald Miller testified that eight to ten days before he and his wife left for Florida, at around 8:30-9:30 a.m., he had observed from his home a black BMW driving very slowly along the private road that comes down the hill from his daughter's home and around the front of his home. Miller indicated that the car sat at the end of the driveway for 10 to 15 minutes; the driver was observing the area, and the driver looked toward Miller. Miller described the BMW's presence as "odd," due to the time of day and the typically "very, very mild traffic" on the private drive. On March 7, after the burglary, Miller's daughter emailed Miller a photo of Boyce. At trial, Miller identified Boyce as the man he had seen driving the BMW in January 2017, prior to the Millers' trip to Florida.

{¶ 20} At approximately 1:21 a.m. on February 17, 2017, the home of Bob and Meredith Patton on Signal Hill Road was burglarized while they were at their cabin in Michigan. Boyce entered through an upstairs window using a wooden ladder. He activated an interior motion detector, and the Pattons were notified by ADT, their alarm company. Sheriff's deputies responded to the home, but did not find anything amiss. At Bob Patton's request, a neighbor checked the home again in the morning and saw a

handmade wooden ladder that did not belong there. Upon returning, the Pattons discovered that jewelry had been taken.

{¶ 21} On February 28, 2017, Springfield Police Officer Derrick Nichols stopped Boyce's vehicle for a traffic violation. During the stop, Nichols's canine partner, Gary, alerted to the presence of an odor of drugs. A search of Boyce's vehicle revealed two bags of marijuana, as well as money, a small bottle with loose diamonds, a metal testing kit, power tools, lawn lights, cellphones, a digital scale, an SD card, and other items. The SD card was later determined to contain the Cochrans' homemade personal video.

{¶ 22} On March 3, 2017, Springfield Detective Michael Curtis obtained a search warrant for Boyce's vehicle. Several items identified during the traffic stop were retrieved from the vehicle, as well as a Garmin GPS unit, rings, a foreign coin, a fork, earring pieces, and a watch wristband. Detective Jerald Mitchell extracted information from the two cellphones and the Garmin device. The Garmin device was found to belong to Peter Freed; Freed testified that the device disappeared in April 2016. After April 2016, the Garmin included locations associated with Boyce and his associates, as well as pawnshops and locations of Buckeye Gold Coin and Jewelry stores, a business that buys precious metals and diamonds.

{¶ 23} Detective Fader of the Clark County Sheriff's Office learned that the Springfield Police Department had impounded Boyce's BMW.[2] Detective Fader obtained

---

[2] Some of the burglarized residences, such as those on Roscommon Drive and in Prestwick Village, were located in the city of Springfield. Others, such as those on Signal Hill Road, Burrwood Street, and Bexley Avenue, were located in Clark County. The Springfield Police Department investigated the burglaries within its jurisdiction, and the Clark County Sheriff's Office investigated those outside of the city. The two departments shared information regarding their investigations.

a warrant to install a GPS tracker on Boyce's BMW.

{¶ 24} On March 7, 2017, Detective Jean Byrne, who worked in the property crimes unit of the Columbus Police Department, received a report from a complainant that the complainant's stolen Apple laptop was pinging at an address on Hidden Acres Court (a townhouse apartment building) in Franklin County. Byrne learned that one apartment was occupied by Boyce and Alyshia Cook and that a Ford Explorer in the lot was registered to Cook. Byrne became aware of the Clark County investigation into Boyce and received access to the GPS device placed on Boyce's BMW. In addition, Columbus police officers began to conduct physical surveillance of Boyce, including following Boyce to different locations that purchased gold and silver.

{¶ 25} On approximately March 22, 2017, Boyce entered the home of Drs. Afshan and Ashfaq Ahmed on Burrwood Drive through a bathroom window; the Ahmeds were out of town at the time, but Afshan Ahmed's father-in-law was staying at the house. Boyce took jewelry, watches, and items from a safe.

{¶ 26} On March 31, 2017, a Springfield police officer pulled over a 2002 Ford Explorer that Boyce was driving, because the plates were registered to a different vehicle. Boyce ultimately received a ticket and was allowed to leave.

{¶ 27} Detective Byrne testified that she noticed a pattern to Boyce's activities in the Beechwold neighborhood, where a home recently had been burglarized. She stated that Boyce would drive slowly through the neighborhood in the evening and then return after 1:00 a.m., park behind a business, and enter the neighborhood on foot. Boyce typically would leave between 3:00 and 4:00 a.m. and return to the Hidden Acres apartment.

{¶ 28} In the early hours of April 3, Columbus police officers observed Boyce as he entered the Beechwold neighborhood; Detective Byrne watched Boyce's parked BMW as other officers in plain clothes surveilled inside the neighborhood. After locating a home on West Royal Forest Boulevard inside which a person was walking with a flashlight, Officers Jason Clark and Adam Hardwick saw Boyce jump out of a front window of the home carrying two bags and then run toward his car. Around 4:45 a.m., Detective Byrne saw Boyce run to his car, put two bags in the vehicle, and drive off. Byrne followed in her vehicle and arranged for cruisers to intercept Boyce. However, Boyce saw a cruiser coming, sped up, and crashed his car; Boyce ran from the vehicle toward his apartment. Byrne instructed the other officers to allow Boyce to return home. Byrne obtained an arrest warrant for Boyce and a search warrant for his apartment.

{¶ 29} Columbus officers executed the search warrant that day (April 3). Detective Byrne contacted Detective Fader, who came to the scene and photographed potential stolen items. The Apple laptop reported by the Columbus complainant was found almost immediately; officers also found an extensive collection of silverware, jewelry, coins, correspondence, stamps, and other items. The property was collected and taken to the Columbus Police Department's property room. Boyce was arrested for the April 3 burglary. The following day, Detective Byrne obtained a search warrant for the crashed BMW and recovered items stolen on April 3.

{¶ 30} Boyce was released on bond, and Columbus police officers continued to watch Boyce's movements. Boyce first drove a red Pontiac and later a silver Chrysler 300. According to Detective Byrne, Boyce resumed his prior behavior, and in June, the Columbus police obtained a warrant to place a GPS tracker on Boyce's silver Chrysler

300.

{¶ 31} Burkhart's electronic monitoring ended on May 25, 2017, and he resumed crimes with Boyce in Springfield/Clark County. Burkhart testified that they usually parked by a Tim Horton's and ended up behind the Prestwick Village community. They checked mailboxes and garages as they went to check if mail were piling up and if people were home. Some nights they did not break into any houses. Burkhart testified that Boyce pointed out a house where he (Boyce) had stolen a pair of diamond earrings worth $10,000, as well as other homes that he (Boyce) had burglarized.

{¶ 32} In late May, the home of John Koehler, who resided in a nursing home, was burglarized. The stolen items included a wedding band, an engagement ring, jewelry with stones representing children and grandchildren, guns, and silver coins and bars.

{¶ 33} In June 2017, Boyce and Burkhart burglarized several condominiums in the Prestwick Village community. Burkhart described one burglary where he needed to use a bench to look in a window. He stated that, at another home (the Haemmerles'), they unplugged the Christmas tree lights, entered through a window, and took jewelry and two guns. Burkhart stated that he wanted to take a BOSE stereo, but Boyce told him to put it back because it would be too noticeable; Boyce reset the clock on the stereo before leaving.

{¶ 34} Burkhart described another burglary (the Timmons's home) where they moved patio furniture, and Boyce used a screwdriver to open a window. Burkhart stated that they found a vase full of coins and, in a bedroom armoire, a sterling silver set and jewelry. They carried the items in a pillowcase. Upon leaving, Boyce put the patio furniture back into place.

{¶ 35} In the early morning hours of June 21, Boyce and Burkhart returned to Prestwick Village. Detective Brian Peabody of the Springfield Police Department, who had access to the GPS data on Boyce's Chrysler 300, coordinated with the Clark County Sheriff's Office to watch for Boyce. Officers saw two men walking in the neighborhood, but the officers could not confirm that a burglary occurred. Burkhart testified that when he and Boyce saw headlights, they ran back to their car. After the two entered the Chrysler, Detective Peabody pulled in front of it to stop it. However, Boyce put the car in reverse and fled.

{¶ 36} Burkhart testified that Boyce's car "sputtered and died" in a nearby alley. Boyce and Burkhart grabbed their identification, and Boyce grabbed his phone and some items from the trunk, the license plates from the vehicle, the screwdriver, and gloves. The two ran from the vehicle. Burkhart stated that Boyce tripped and dropped his phone, and ultimately left without it. The two ended up hiding for several hours. Officers searched for Boyce and his accomplice, but did not locate them.

{¶ 37} On the night of July 6-7, Boyce visited with Kayla Carter and left Carter's residence at 12:49 a.m. Sometime later, Boyce and Burkhart entered the home of Joan and Peter Geil through a window on the back porch. They took silver flatware, jewelry, cash, and silver coins from a safe in the basement. Boyce and Burkhart wiped their footprints from the back porch before they left. Boyce returned to Carter's apartment while she was still in bed. After waking, Carter noticed a bag that had not previously been in her apartment. That afternoon, United States Marshals arrested Boyce at Carter's home on an arrest warrant, and officers collected numerous items from the apartment. The Geils identified most of the items collected from Carter's residence as

theirs.

{¶ 38} The State presented extensive evidence that Boyce kept stolen items at multiple residences, including his and Alysia Cook's Columbus residence on Hidden Acres, his sister's apartment in Columbus, and the apartment of Chelsea Quisenberry in Springfield. Burkhart testified that he had met Cook at the apartment in Columbus and had met Quiana Boyce, Boyce's sister, at her home. Burkhart remembered Boyce's having stolen diamonds at his sister's house. In addition, witnesses testified that Boyce tested the stolen diamonds (to determine if they were real) and gold items (to determine carat) and dismantled jewelry prior to selling the items. Both Burkhart and Victoria Nored testified that they had observed Boyce break jewelry apart; Burkhart stated that he saw Boyce separate diamonds from gold or silver with pliers.

{¶ 39} There was substantial evidence that Boyce had other individuals sell stolen items at pawn shops or stores that purchased gold and silver. Kyle Smith, Shaqueeta Terrell, Quiana Boyce, and Kenia Lacey sold numerous items at various Buckeye Gold Coin and Jewelry locations. On seven different occasions, Terrell, Lacey, Quiana Boyce, Nored, or Cook sold items at Allen's Coin Shop in Westerville. At trial, Nored described the two times that Boyce drove her to Allen's Coin Shop (May 31, 2017 and June 19, 2017) to sell items for him; she stated that Boyce paid her $50 each time for her efforts. Burkhart also testified that Boyce said that he (Boyce) would drive someone to various jewelry stores in Columbus to sell the items he stole. Burkhart stated that he once went with Boyce and Kyle to a jewelry store, where Kyle sold the items and gave the receipt and $900 or $1,000 to Boyce; Boyce paid Kyle about $40 for selling the items for him. Burkhart once sold a Ziploc bag of small diamonds for Boyce at the jewelry store near

Burkhart's home.

{¶ 40} In 2017, many of the burglary victims were invited to look at property that had been recovered during the Springfield/Clark County and Columbus investigations. Mrs. Parsons found a locket of hers containing her and her sister's baby photos and family correspondence that had belonged to her father; the locket and correspondence had been missing since the 2008 burglary. Many of the complainants from the 18 burglaries in 2016 and 2017 identified something that had been stolen from their homes. Some complainants were able to identify their property as property sold by Boyce's associates to a pawn shop or a store that bought precious metals.

{¶ 41} In December 2017, Prestwick Village residents Jim and Judy Roediger received an email from Kay Shell in which Shell asked if anyone could identify a fraternity pin that the police had recovered. The Roedigers recognized the pin as belonging to Mr. Roediger. At that juncture, the Roedigers realized that their home had previously been burglarized and that additional items, including silver dollars and jewelry, were missing.

{¶ 42} In June 2017, Boyce was originally charged with 19 counts: one count of engaging in pattern of corrupt activity and numerous counts of burglary and receiving stolen property. *See* Clark C.P. No. 2017-CR-365A. The State charged Boyce with two additional counts of burglary and one additional count of receiving stolen property in August 2017. *See* Clark C.P. No. 2017-CR-510.

{¶ 43} In November 2017, as part of Case No. 2017-CR-365A, Boyce filed three motions to suppress evidence against him. The first motion to suppress challenged the lawfulness of the February 28, 2017 stop and search of his BMW, the March 2 search of the BMW pursuant to a search warrant, the March 3 search of three cellphones and the

Garmin GPS device found in the vehicle, and sought to suppress any statements he made. The second motion sought to suppress any evidence obtained as a result of the April 5, 2017 search of the BMW, pursuant to a search warrant. The third motion sought to suppress the evidence seized from the execution of the April 3, 2017 search warrant at Alysia Cook's residence on Hidden Acres Court in Columbus.

{¶ 44} On December 4, 2017, Boyce was indicted in this case, Case No. 2017-CR-761A, on fourteen counts of burglary as third-degree felonies; one count of burglary as a second-degree felony; six counts of receiving stolen property, three of which were fifth-degree felonies and three of which were misdemeanors of the first degree; and one count of engaging in a pattern of corrupt activity, a first-degree felony.[3] The indictment also sought the forfeiture of three vehicles owned by Boyce.

{¶ 45} Soon thereafter, the State filed a notice, pursuant to Evid.R. 404(B), that it intended to present evidence at trial regarding the facts underlying Boyce's prior conviction for burglary in Case No. 2008-CR-612 (the Parsons burglary), which was listed as one of the predicate acts for the engaging in corrupt activity charge.

{¶ 46} On December 19, 2017, the court ordered that the filings in the two prior cases to be incorporated into Clark C.P. No. 2017-CR-761A, and that the two prior cases be dismissed.

{¶ 47} In January 2018, in Case No. 2018-CR-55, the State charged Boyce with three additional counts of burglary, one of which was a second-degree felony and two of

---

[3] The indictment also included three additional charges of receiving stolen property by co-defendants Kenia Lacey, Shaqueeta Terrell, and Quiana Boyce (Counts 17-19). Those co-defendants, as well as Alyshia Cook, were named with Boyce in Count 25, alleging engaging in a pattern of corrupt activity.

which were third-degree felonies.   The trial court subsequently consolidated Case No. 2018-CR-55 into Case No. 2017-CR-761A.

{¶ 48} As a result of the various consolidations, Boyce faced 25 counts in this case: one count of engaging in a pattern of corrupt activity; 18 counts of burglary; and six counts of receiving stolen property.   The charges are reflected in the following table.

| Count | Charge | Statute | Degree | Complainant[4] |
|-------|--------|---------|--------|-------------|
| 1 | Burglary | R.C. 2911.12(A)(3) | F3 | McCready |
| 2 | Receiving Stolen Property | R.C. 2913.51(A) | F5 | McCready |
| 3 | Burglary | R.C. 2911.12(A)(3) | F3 | Compton |
| 4 | Burglary | R.C. 2911.12(A)(3) | F3 | Field |
| 5 | Burglary | R.C. 2911.12(A)(3) | F3 | Cochran |
| 6 | Receiving Stolen Property | R.C. 2913.51(A) | M1 | Cochran |
| 7 | Burglary | R.C. 2911.12(A)(3) | F3 | R. McGregor |
| 8 | Burglary | R.C. 2911.12(A)(3) | F3 | N. McGregor |
| 9 | Burglary | R.C. 2911.12(A)(3) | F3 | Perks |
| 10 | Burglary | R.C. 2911.12(A)(3) | F3 | Dolbeer |
| 11 | Burglary | R.C. 2911.12(A)(3) | F3 | Miller |
| 12 | Receiving Stolen Property | R.C. 2913.51(A) | M1 | Miller |
| 13 | Burglary | R.C. 2911.12(A)(3) | F3 | Patton |
| 14 | Receiving Stolen Property | R.C. 2913.51(A) | M1 | Patton |
| 15 | Burglary | R.C. 2911.12(A)(1) | F2 | Ahmed |
| 16 | Receiving Stolen Property | R.C. 2913.51(A) | F5 | Ahmed |
| 20 | Burglary | R.C. 2911.12(A)(3) | F3 | Koehler |
| 21 | Burglary | R.C. 2911.12(A)(3) | F3 | Haemmerle |
| 22 | Burglary | R.C. 2911.12(A)(3) | F3 | Timmons |
| 23 | Burglary | R.C. 2911.12(A)(3) | F3 | Geil |
| 24 | Receiving Stolen Property | R.C. 2913.51(A) | F5 | Geil |
| 25 | Engaging in a Pattern of Corrupt Activity | R.C. 2923.32(A)(1) | F1 | N/A |
| 26 | Burglary | R.C. 2911.12(A)(3) | F3 | Galluch |

---

[4] The complainants were identified on the verdict forms, not in the indictment.

| 27 | Burglary | R.C. 2911.12(A)(1) | F2 | Shell |
| 28 | Burglary | R.C. 2911.12(A)(3) | F3 | Roediger |

{¶ 49} On January 8, 2019, the trial court held a hearing on Boyce's motions to suppress. The State presented the testimony of Officer Derrick Nichols regarding the February 28, 2017 traffic stop and the testimony of Detective Jean Byrne regarding search warrants obtained in Franklin County, along with eight exhibits. Boyce testified on his own behalf. On January 24, 2019, the trial court overruled the motions, concluding that Officer Nichols lawfully stopped Boyce's vehicle for the traffic offense he witnessed, that the officer "was diligent in his investigation in the course of the lawful traffic stop," that the dog sniff did not constitute a search, and that the dog's alert provided probable cause to search Boyce's vehicle. The court further found that the issuing judges had a substantial basis for concluding that the affidavits accompanying the five search warrants at issue contained sufficient indicia of probable cause to satisfy the Fourth Amendment.[5]

{¶ 50} In March 2018, Boyce expressed to the trial court that he wished to fire his attorney and proceed pro se. After a hearing on the matter, the trial court granted Boyce's motion and Boyce signed a written waiver of counsel. Boyce's prior defense counsel was appointed as stand-by counsel.

{¶ 51} On April 19, 2018, at a pretrial conference, the court addressed, among

---

[5] The State also raised that Boyce had previously challenged the traffic stop in the Clark County Municipal Court (Clark M.C. Nos. 17-CRB-782 and 17-TR-2462). The trial court decided against applying res judicata to the municipal court's decision, because (1) Boyce, at that time, believed he was only defending himself against traffic and misdemeanor offenses and therefore may not have thoroughly developed all issues potentially related to more serious offenses, and (2) Boyce had represented himself in the municipal court, but was represented by counsel in the common pleas court.

other matters, the State's request to use Evid.R. 404(B) evidence at trial. The court concluded that the evidence was admissible for the limited purposes presented by the State to show intent, identity, preparation, and plan. The trial court further concluded that "the prejudicial effect upon the defendant is negligible since said conviction is listed as a predicate act under the engaging in a pattern of corrupt activity offense and therefore it would have lawfully been presented and admitted irrespective of the 404(B) issue."

{¶ 52} The matter proceeded to a lengthy jury trial beginning on April 23, 2018. Boyce offered several witnesses and testified on his own behalf. Stated generally, he denied that he participated in any of the burglaries in 2016 and 2017, and he asserted that his alleged accomplices sold only items that lawfully belonged to them. Boyce claimed that the complainants were mistaken when they identified property as theirs.

{¶ 53} After deliberations, the jury convicted Boyce of all counts, with the exception that one burglary charge (Count 15) was reduced from a second-degree felony to a third-degree felony. The jury found that all 15 of the alleged predicate acts for engaging in a pattern of corrupt activity were proven beyond a reasonable doubt and that the three identified vehicles were subject to forfeiture to the State.

{¶ 54} The court subsequently sentenced Boyce as follows:

| OFFENSE | COUNT(S) | DEGREE | SENTENCE |
| --- | --- | --- | --- |
| Engaging in a Pattern of Corrupt Activity | 25 | F1 | 11 years |
| Burglary | 27 | F2 | 8 years |
| Burglary | 1, 3-5, 7-11, 13, 15, 20-23, 26, 28 | F3 | 3 years |
| Receiving Stolen Property | 2, 16, (19[6]), 24 | F5 | 1 year |

[6] The trial court, orally and in its judgment, imposed a one-year sentence on Count 19,

| Receiving Stolen Property | 6, 12, 14 | M1 | 6 months |
|---|---|---|---|

The trial court ordered the sentences for burglary and engaging in a pattern of corrupt of activity to be served consecutively, for an aggregate sentence of 70 years in prison. The trial court ordered that the sentences for felony receiving stolen property be served consecutively to each other, but that all of the sentences for receiving stolen property (felony and misdemeanor) be served concurrently with the sentences for burglary and engaging in a pattern of corrupt of activity. The court notified Boyce that five years of post-release control was mandatory in this case.

{¶ 55} The trial court ordered Boyce to pay restitution of $3,049.94, to be satisfied from the money that had been seized from Boyce. The court further ordered that Boyce's three vehicles be forfeited to the State for law enforcement use.

{¶ 56} Boyce appeals, raising four assignments of error. We will address them in a manner that facilitates our analysis.

## II. Motion to Suppress

{¶ 57} In his third assignment of error, Boyce claims that the trial court erred in denying the motion to suppress that challenged the warrantless search of his vehicle. Boyce argues that the police officer unreasonably prolonged the traffic stop by conducting

---

which concerned one of Boyce's co-defendants, Quiana Boyce, only. The court ordered the sentences for felony receiving stolen property to be served consecutively, for a total of four years. On May 29, 2018, in an effort to correct the error, the trial court filed an amended judgment, striking the one-year sentence on Count 19 and amending the first full paragraph on page five to read, "IT IS FURTHER ORDERED that all felony receiving stolen property offenses *(Counts 2, 16, and 24)* run consecutively to one another for a total of three (3) years OSP." (Emphasis sic.) We will discuss the effect of the trial court's amended judgment in our discussion of Boyce's sentence below.

a free air sniff with the officer's canine partner. Boyce had also challenged the validity of several search warrants in the trial court, but he does not claim on appeal that the trial court erred in overruling his motions to suppress as it related to the search warrants.

{¶ 58} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 59} Springfield Police Officer Derrick Nichols testified on the behalf of the State.[7] According to his testimony, Officer Nichols had been an officer with the Springfield Police Department for 11 years and had been a canine officer for four years. Nichols's canine partner was named Gary. Gary had three weeks of skills training, learning tracking, drug smells, and the like. Both Nichols and Gary went through specialized training with a master trainer in Fremont, Ohio, and were certified through the State of Ohio and nationally. The two had continuing training together.

{¶ 60} Shortly before 7:30 p.m. on February 28, 2017, Officer Nichols and Gary

---

[7] The State also called Detective Jean Byrne of the Columbus Division of Police, who testified regarding search warrants and an arrest warrant for Boyce that were obtained in Franklin County. The detective's testimony and the accompanying exhibits are not relevant to the issue before us.

were in a marked cruiser on East Pleasant Street at the intersection with South Limestone Street in Clark County. Nichols testified that he was stopped at a red light behind a black BMW in the turn lane to go south on South Limestone. When the light turned green, the BMW proceeded straight through the intersection. Officer Nichols got behind the BMW and ran the license plate. The plate came back to Boyce. Nichols was aware that Boyce was a suspect in some thefts and burglaries in Clark County.

{¶ 61} At 7:32 p.m., Officer Nichols initiated a traffic stop for the lane violation. Nichols testified that he walked up to the BMW and recognized Boyce as the driver; Nichols also identified Boyce as the driver at the suppression hearing. There were no passengers. The officer talked with Boyce and obtained Boyce's driver's license and insurance card.

{¶ 62} Nichols returned to his cruiser and relayed Boyce's information to dispatch. The dispatch log indicated that Boyce's birthdate and Social Security number were provided or entered at 7:35 p.m. A minute later, dispatch indicated that Boyce did not have any warrants, was a career criminal for aggravated robbery, and had a valid license.

{¶ 63} About that time, Officer Freeman arrived, and Officer Nichols notified dispatch that he was going to "run the dog around the car." The officers had Boyce exit his vehicle, and Officer Nichols patted him down. Officer Freeman stood with Boyce at the sidewalk while Officer Nichols got Gary from his cruiser.

{¶ 64} Officer Nichols proceeded to walk Gary around the BMW, beginning at the rear passenger side of the vehicle, then along the passenger side and around the front. Officer Nichols testified that Gary stopped at the driver's window, hopped up and put his head inside briefly, and then sat down. Officer Nichols continued down the car, and Gary

"started positively indicating by pawing or scratching at the driver's door." Nichols testified that six minutes elapsed between the stop of the BMW and the positive indication by Gary. He stated that a typical traffic stop takes approximately 14 minutes.

{¶ 65} Following Gary's positive alert, Officers Freeman and Nichols searched Boyce's vehicle. They located scales and approximately 53 grams of marijuana in the trunk of the vehicle. At 7:47 p.m., Officer Nichols indicated to dispatch that he had an individual in custody. Nichols stated that he arrested Boyce for possession of and trafficking in marijuana.

{¶ 66} Boyce testified on his own behalf. Boyce acknowledged that he was driving alone in his BMW on February 28, 2017, when he was stopped by the police. Boyce stated that, when he was taken out of his vehicle, the officer "forced me to stand on the side of the sidewalk." He was not handcuffed, but an officer was standing there with him. Boyce testified that 15 to 20 minutes elapsed between the stop and when the dog approached his vehicle.

{¶ 67} Boyce saw an officer begin to walk his canine around the passenger side of Boyce's vehicle, and Boyce moved around so that he could watch what was happening. Boyce claimed he did not see the dog go near the driver's door of the vehicle or alert. Boyce testified that, when Officer Nichols was standing by the driver's side headlight, Officer Nichols said that the dog had alerted. Boyce said that he never saw the dog near the driver's door, nor did he see the dog scratch or paw at his car. On redirect examination, Boyce asserted that the dog acted differently during another traffic stop on a later date. On re-cross examination, however, Boyce agreed that he was pulled over around that same time period by a different canine officer, Officer Kevin Hoying; Boyce

did not know if Officer Hoying had the same dog.

{¶ 68} After Officer Nichols indicated that his dog had alerted, Officer Freeman told Boyce that the officers could search his vehicle. Boyce acknowledged that the officers found marijuana during the search of his car. He also stated that he owned the cellphones, SD card, digital scale, jewelry, precious metals testing kit, masks, sander, bag of small bottles, gold light box, and landscaping lights that also were in the vehicle. Boyce stated that he was handcuffed after the search was completed.

{¶ 69} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot, including a minor traffic violation. *Id.*; *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991).

{¶ 70} Boyce does not claim that the initial stop of his vehicle was unlawful. Nevertheless, the trial court found, and we agree, that Officer Nichols's observation of Boyce's driving straight through an intersection from a marked turn lane provided reasonable suspicion that Boyce had committed a traffic violation, thus justifying the officer's stop of the BMW.

{¶ 71} Law enforcement officers may detain the driver and any passengers only for the time necessary to complete the reason for the stop. *Kettering v. Maston*, 2d Dist. Montgomery No. 27567, 2018-Ohio-1948, ¶ 17. When a law enforcement officer stops a vehicle for a traffic violation, the officer may detain the motorist for a period of time sufficient to issue the motorist a citation and perform routine procedures, such as a computer check on the motorist's driver's license, registration and vehicle plates. *Id*; *State v. Thomas*, 2d Dist. Montgomery No. 22833, 2009-Ohio-3520, ¶ 14, citing *State v. Pryor*, 2d Dist. Montgomery No. 20800, 2005-Ohio-2770, ¶ 15.

{¶ 72} "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015). *Rodriguez* made clear "that an officer may not prolong a traffic stop to perform a drug sniff even if the 'overall duration of the stop remains reasonable in relation to the duration of other stops involving similar circumstances.' " *State v. Hall*, 2017-Ohio-2682, 90 N.E.3d 276, ¶ 13 (2d Dist.), quoting *Rodriguez*, 575 U.S. at 357.

{¶ 73} A police officer need not have a reasonable suspicion that a vehicle contains contraband prior to summoning a canine drug unit or conducting a canine free air sniff. *Thomas* at ¶ 15. Furthermore, the use of a trained narcotics dog to sniff an automobile does not constitute a "search" under the Fourth Amendment. *State v. Raslovksy*, 2d Dist. Clark No. 2019-CA-55, 2020-Ohio-515, ¶ 14, citing *Illinois v. Caballes*, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). If a trained canine alerts to the

odor of drugs from a lawfully stopped and detained vehicle, an officer has probable cause to search the vehicle for contraband.[8]  *Id.*, citing *Florida v. Harris*, 568 U.S. 237, 250, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013).

**{¶ 74}** In this case, Boyce emphasizes that he was stopped by a canine officer, whose canine partner was in the cruiser.   Boyce argues that Officer Nichols should have been working on the traffic citation instead of walking his dog around Boyce's vehicle and that the officer's decision to walk his canine partner around Boyce's vehicle unlawfully prolonged the stop.

**{¶ 75}** We find Boyce's circumstances to be similar to those in *Maston*, 2d Dist. Montgomery No. 27567, 2018-Ohio-1948.   In that case, the vehicle in which Maston was a passenger was stopped by Officer Maloney, a canine officer, due to a traffic violation. Upon stopping the vehicle, Maloney approached the vehicle and recognized the couple, who had been involved in several domestic incidents that had resulted in the arrest of Maston.   The officer asked if he could search the vehicle, but he did not get a clear response.   Officer Maloney called for back-up and then proceeded to look into the couple's "criminal history" and "call history" on Justice Web and to begin writing a traffic ticket.   Another officer, Officer Anderson, arrived seven minutes after the stop began,

---

[8] We recognize that the passage of Ohio's hemp legalization law and the legalization of medical marijuana in Ohio complicates whether an alert by a dog trained to detect marijuana provides probable cause to search a vehicle.   However, neither the motion to suppress nor any argument at the suppression hearing raised whether Gary's alert was sufficient to establish probable cause to search Boyce's vehicle.   Accordingly, the issue is waived.   *See, e.g., State v. Matthews*, 2d Dist. Miami No. 2014-CA-23, 2015-Ohio-1750, ¶ 29 (defendant waived any argument regarding the dog's or handler's qualifications for purposes of appeal by failing to raise these issues in his motion to suppress and failing to object at the suppression hearing to the officer's testimony about the use of the dog to establish probable cause to search the vehicle).

while Office Maloney was still in the process of writing the traffic ticket. At that juncture, the occupants were removed from the vehicle, and Officer Maloney walked his canine partner, Jax, around the vehicle. Jax alerted to the presence of illegal drugs. The officers subsequently searched the vehicle and located marijuana and Xanax.

{¶ 76} On review, we held that the traffic stop had not been unlawfully prolonged by the search of the vehicle. We reasoned that "Officer Maloney's testimony at the suppression hearing demonstrated that, as required by *Rodriguez*, he diligently performed the tasks necessary to complete the traffic stop until Officer Anderson arrived, at which time he conducted the free-air sniff by Jax." *Id.* at ¶ 20. And, once Jax alerted on the vehicle, indicating the presence of illegal drugs, the officers had probable cause to search the vehicle. *Id.*

{¶ 77} According to Officer Nichols's testimony, which the trial court believed, Officer Nichols stopped Boyce's vehicle at 7:32 p.m. and obtained Boyce's driver's license and insurance card. The officer then returned to his cruiser and provided Boyce's information to dispatch; Boyce's birthdate and Social Security number were provided or entered into the dispatch log at 7:35 p.m. About a minute later, another officer arrived, and dispatch also responded with information about Boyce. After Officer Freeman's arrival, Boyce was removed from his vehicle, and Officer Nichols proceeded to walk Gary around Boyce's BMW.

{¶ 78} As with *Maston*, Officer Nichols diligently conducted the traffic investigation up to the time when the officers removed Boyce from his vehicle and Officer Nichols walked his canine partner around Boyce's BMW. Officer Nichols spent the first four minutes performing the standard background investigation into Boyce through dispatch.

Officer Freeman arrived while Officer Nichols was conducting that standard background investigation, and Officer Nichols proceeded with the free air dog sniff upon Officer Freeman's arrival. Gary alerted to drugs six minutes after the stop began, and his alert provided probable cause for the officers' search of the BMW. The traffic stop of Boyce's BMW was not unreasonably prolonged by Officer Nichols's conducting a free air sniff by his canine partner.

{¶ 79} Boyce's third assignment of error is overruled.

### III. Admission of Boyce's Prior 2008 Burglary Conviction

{¶ 80} In his first assignment of error, Boyce claims that the "trial court erred when it allowed the State to introduce evidence about specific facts regarding Mr. Boyce's prior burglary conviction." His second assignment of error claims that the trial court erred when it failed to provide a limiting instruction about his prior burglary conviction (the Parsons burglary), either prior to testimony concerning the circumstances giving rise to his prior burglary conviction or in its jury instructions at the conclusion of the testimony. Boyce did not request a limiting instruction at trial prior to testimony about his burglary of the Parsons' home.

{¶ 81} According to the parties' stipulation, filed prior to trial, Boyce was convicted in Case No. 2008-CR-612 of a burglary that occurred at the Parsons' residence on North Limestone Street in Springfield. In that case, mail addressed to the Parsons and their neighbors was collected in a wooded area approximately 250 feet south of the main driveway of the Parsons' home. Boyce's fingerprints were found on the mail. On June 4, 2008, Boyce sold jewelry taken from the burglary at Quick Cash Pawn, Inc., in Greendale, Indiana.

{¶ 82} Count 25 of the indictment filed in this case (Case No. 2017-CR-761A) alleged that Boyce and others engaged in a pattern of corrupt activity. The charge alleged numerous predicate acts: 19 of the other counts alleged in the indictment, Boyce's prior conviction in Case No. 2005-CR-1114 for receiving stolen property, Boyce's prior conviction in Case No. 2008-CR-363 for receiving stolen property, Boyce's prior convictions for burglary and receiving stolen property in Case No. 2008-CR-612, the April 3, 2017 burglary/receiving stolen property in Franklin County, and several other instances of receiving stolen property by Boyce and his accomplices in Franklin County in 2016 and 2017.

{¶ 83} In December 2017, the State filed a notice, pursuant to Evid.R. 404(B), that it intended to introduce evidence of other crimes, wrongs, or acts by Boyce at trial, specifically evidence regarding Boyce's prior conviction for burglary in Case No. 2008-CR-612. The State noted that the conviction was an underlying predicate act for the count of engaging in a pattern of corrupt activity. The State further stated:

> * * * In addition to the existence of the conviction, the State intends to present limited factual evidence from the charge set forth in case number 08-CR-612. Specifically, in the 08-CR-612 case, prior to burglarizing the residence * * *, the Defendant took mail from the mailbox of that residence in an attempt to determine whether the inhabitants of the residence were home. He dropped this mail in the woods near the house then broke into the house and stole jewelry and other items. The Defendant's fingerprints were found on the mail recovered from the woods. [The Parsons residence] is within a mile of several of the houses burglarized in the current

cases. These houses were burglarized under similar conditions to the Defendant's prior conviction in 08-CR-612. Furthermore, in the case at hand, an invoice taken from the mailbox located [on] Burwood Drive was found in the woods during the burglary investigation of [the] residence located [on] Roscommon Drive. [Another property on] Burwood Drive was then later burglarized and is included in this indictment. Finally, a locket with family pictures was taken during the burglary of [the Parsons residence] in case number 08-CR-612. That locket was recovered during the April 3, 2017 search warrant of the Defendant's apartment in Columbus during this current investigation.

The State argued that limited factual evidence related to Case No. 2008-CR-612 was relevant to demonstrate the planning and preparation that Boyce engaged in and that Boyce utilized the same scheme or plan in the current case as he did in Case No. 2008-CR-612.

{¶ 84} The State's Evid.R. 404(B) notice was discussed in a pretrial conference on April 19, 2018. Boyce, representing himself, argued that Case No. 2008-CR-612 was dissimilar from the current charges, including that no mail was discovered on the ground in the current cases and his fingerprints were not present. The State responded that Case No. 2008-CR-612 was a predicate act, and the facts of that prior case demonstrated that Boyce was part of a criminal enterprise. The prosecutor clarified that the evidence would show that Boyce had "established houses or places that he can hold this property for long periods of time." The prosecutor noted that Boyce had gone to prison for eight years, and yet the 2017 search warrant at his apartment yielded evidence from the 2008

burglaries.

{¶ 85} The prosecutor further argued that Boyce had "a very specific MO. That MO includes scouting houses. * * * One of the methods he used was to go through mailboxes." The State thus asserted that the 2008-CR-612 conviction was "directly on point to show his common plan or scheme with how he scouts and that put him in the current case." The prosecutor further argued that the evidence was admissible to show that Boyce had learned from his mistakes: he more recently wore gloves and masks.

{¶ 86} The trial court orally ruled that evidence regarding Boyce's conviction in Case No. 2008-CR-612 was "admissible for those limited purposes under 404(B)." The court further stated: "More significantly, evidence of this prior conviction is going to come in anyways because it's listed as one of the predicate acts so any incremental prejudice is nullified in the Court's view * * *."

{¶ 87} The same day (April 19), the trial court filed a written entry memorializing the issues addressed at the April 19 pretrial conference. As to the Evid.R. 404(B) issue, the court summarized the matter as follows:

> The parties argued orally with respect to the written Evidentiary Rule 404(B) Notice the State had filed. The Court ruled that the 404(B) evidence the State intends to present by way of a prior conviction is admissible. Said evidence is relevant to show intent, identity, preparation, and plan, and the prejudicial effect upon the defendant is negligible since said conviction is listed as a predicate act under the engaging in a pattern of corrupt activity offense and therefore it would have lawfully been presented and admitted irrespective of the 404(B) issue.

{¶ 88} Boyce and the State filed the stipulation regarding the basic underlying facts of Case No. 2008-CR-612 on April 20, 2019.

{¶ 89} On the second day of trial, the State presented testimony from three witnesses regarding Case No. 2008-CR-612.   Melissa Tuttle, the Clark County Clerk of Courts, testified that State's Exhibits 124 and 124A were certified copies of Boyce's convictions for two different counts (burglary, a third-degree felony, and receiving stolen property, a fifth-degree felony) in that case.   Tuttle also testified that State's Exhibit 124B was a certified copy of the warrant on the indictment in Case No. 2008-CR-612, which showed Boyce's birthdate and Social Security number.   Chris Kinsler, a former Clark County prosecutor, identified Boyce as the defendant in Case No. 2008-CR-612, and stated that Mr. and Mrs. Parsons were the victims in that case.

{¶ 90} Jade Parsons described her home and stated that it was broken into in late May 2008, while she and her husband were out of town.   She testified that she found her home "ransacked" when she returned; the lines to her telephone, cable, and alarm system had been cut.   Mrs. Parsons testified that jewelry was taken from upstairs and that the safe in her basement had been pried and drilled open with the Parsons' tools; the safe had contained some gold coins, cash, guns, and jewelry.   Mrs. Parsons stated that a shoebox with old letters belonging to her late father was also missing.   Mrs. Parsons testified that she went to a pawnshop in Indiana at the request of investigators and identified three or four pieces that belonged to her.   In 2017, she was invited to look at property that was recovered as part of a current investigation; Mrs. Parsons testified that she saw letters to her father and other relatives and a locket that belonged to her.   Mrs. Parsons's testimony consisted of 37 pages of transcript.

**{¶ 91}** During closing argument, the prosecutor summarized the course of Boyce's numerous offenses, the connection of Boyce's activities to those of his accomplices who stored and/or sold stolen items, and the course of the various law enforcement investigations into Boyce's and his accomplices' activities. The prosecutor began with the Parsons' burglary, describing how the 2008 burglary occurred and how Boyce later adjusted his procedures to avoid leaving the kind of evidence that led to his conviction for that burglary, i.e., using gloves and having others sell the stolen goods. The prosecutor also stated that "the other reason the Parsons burglary is important is it shows the warehouse element." The prosecutor reminded the jury that, in 2017, Jade Parsons identified old family letters and a locket with her photo; those items had been found in Boyce's Columbus apartment during the April 3, 2017 execution of the search warrant. The prosecution's closing argument consisted of 114 pages of transcript, of which the discussion of the Parsons burglary took six pages.

**{¶ 92}** After closing arguments, the trial court instructed the jury. As to prior bad acts, the court stated, without objection from Boyce:

> * * * Sometimes evidence is admissible for only a limited purpose. In these situations, Evidentiary Rule 105 requires the Court to restrict the evidence to its proper scope and instruct the jury accordingly.
>
> The law and fundamental fairness prohibit you from drawing an inference that other bad acts and/or crimes alleged to have been committed by the defendant make it more likely that he committed the offenses for which he is on trial.
>
> Accordingly, evidence that the defendant committed bad acts and/or

crimes other than those charged in the indictment is typically not admissible. There are, however, some exceptions to this rule of law.

One exception, which applies in this case, arises when the defendant is charged with engaging in a pattern of corrupt activity, requiring the State to prove a pattern of bad acts and/or crimes, some of which may be criminal convictions.

To that end, the State has presented evidence in this case that the defendant was previously convicted of burglary and receiving stolen property. Another exception to this rule of law arises when the defendant takes the witness stand in his own defense giving the State the opportunity to impeach with prior convictions.

If you find that the State has failed to prove these other bad acts and/or crimes beyond a reasonable doubt, you're to disregard them and not permit them to influence your deliberations.

If you find that the State has proven them beyond a reasonable doubt, you may consider that evidence, but only for the limited purposes of determining whether it proves a pattern of corrupt activity and evaluating the defendant's credibility as a witness.

You may not consider it for purposes of drawing the aforementioned forbidden inference.

**{¶ 93}** Upon review of the record, we find no error concerning the trial court's handling of Boyce's conviction in Case No. 2008-CR-612.

**{¶ 94}** Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not

admissible to prove the character of a person in order to show action in conformity therewith.   It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."   The Ohio Supreme Court has discussed Evid.R. 404, stating:

> Evid.R. 404 codifies the common law with respect to evidence of other acts of wrongdoing. The rule contemplates acts that may or may not be similar to the crime at issue. If the other act is offered for some relevant purpose other than to show character and propensity to commit crime, such as one of the purposes in the listing, the other act may be admissible. Another consideration permitting the admission of certain other-acts evidence is whether the other acts "form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment" and are "inextricably related" to the crime.

(Citations omitted.) *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 13.

{¶ 95} Courts employ a three-step analysis to determine whether to admit other-acts evidence:

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is

presented for a legitimate purpose, such as those stated in Evid.R. 404(B).

The third step is to consider whether the probative value of the other acts

evidence is substantially outweighed by the danger of unfair prejudice. *See*

Evid.R 403.

*State v. Hare*, 2018-Ohio-765, 108 N.E.3d 172, ¶ 42 (2d Dist.), quoting *State v. Williams*,

134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20.

**{¶ 96}** A trial court has broad discretion to admit or exclude evidence, and its

exercise of that discretion will not be disturbed on appeal absent an abuse of discretion.

*State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 14. "A trial court

abuses its discretion when it makes a decision that is unreasonable, unconscionable, or

arbitrary." *State v. Darmond,* 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

**{¶ 97}** We find no abuse of discretion here. Most significantly, the State had

alleged in the indictment that the Case No. 2008-CR-612 burglary was a predicate act for

the charge of engaging in a pattern of corrupt activity. Consistent with the indictment,

the State's evidence at trial regarding the events underlying Case No. 2008-CR-612, i.e.,

the burglary of the Parsons' home, served to establish a pattern of corrupt activity by

Boyce by demonstrating that Boyce's more recent burglaries in 2016 and 2017 were an

extension of his prior conduct. The State's evidence revealed commonalities in the

methods used to commit the Parsons' burglary and the recent burglaries, as well as the

improvements in Boyce's procedures after his release from prison in 2016. In addition,

the fact that items stolen from the Parsons in 2008 were in his continued possession

almost a decade later, along with other recently stolen items, provided additional evidence

that Boyce was engaged in an ongoing enterprise that stored stolen items in accomplices'

homes and used those and other accomplices to sell certain types of stolen items.

{¶ 98} Consequently, the evidence "was an integral part of the State's proof of the charge of engaging in a pattern of corrupt activity, not 'other acts' evidence." *State v. Rich*, 2d Dist. Montgomery No. 27356, 2018-Ohio-1225, ¶ 31. *See also State v. Saxton*, 9th Dist. Lorain Nos. 02CA8029, 02CA8030, 2003-Ohio-3158, ¶ 28, citing *State v. Frato*, 9th Dist. Lorain Nos. 91CA005237, 91CA005238, 1992 WL 227955, * 4 (Sept. 16, 1992) ("When other acts testimony is relevant to prove a pattern of corrupt activity pursuant to R.C. 2923.32(A)(1), it is not inadmissible under Evid.R. 404(B)."). The trial court did not abuse its discretion in permitting the State to present evidence regarding the Parsons' burglary at trial.

{¶ 99} The trial court also appropriately addressed "prior bad act" evidence in its jury instructions. The court informed the jury, without objection from Boyce, that evidence of Boyce's prior bad acts, including his prior convictions, could be considered only in limited circumstances: to establish that Boyce was engaged in a pattern of corrupt activity, as charged, or to impeach Boyce's credibility as a witness. The court further made clear that, if the jury found that the State had failed to prove these other bad acts and/or crimes beyond a reasonable doubt, the jury was to disregard them entirely and not allow them to influence their deliberations. The trial court's instructions reasonably guided the jury's consideration of the 2008 burglary of the Parsons home.

{¶ 100} Boyce's first and second assignments of error are overruled.

### IV. Boyce's Sentence

{¶ 101} In his fourth assignment of error, Boyce claims that his sentence is clearly and convincingly unsupported by the record. Boyce argues:

It is true that Mr. Boyce has past criminal convictions, and he was convicted of numerous felonies in the instant case. But given that no weapons were involved, the total amount of restitution ordered was just over $3,000, and no individual was physically harmed or threatened with physical harm, the minimum sanction necessary to punish Mr. Boyce and protect the public is not a 70-year sentence.

**{¶ 102}** In reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2), rather than an abuse of discretion standard. *See State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 9. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law. *State v. Huffman*, 2d Dist. Miami No. 2016-CA-16, 2017-Ohio-4097, ¶ 6.

**{¶ 103}** "The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences." *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.). However, in exercising its discretion, a trial court must consider the statutory policies that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12. *State v. Leopard*, 194 Ohio App.3d 500, 2011-Ohio-3864, 957 N.E.2d 55, ¶ 11 (2d Dist.), citing *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 38.

**{¶ 104}** R.C. 2929.11 requires trial courts to be guided by the overriding purposes

of felony sentencing.   Those purposes are "to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources."   R.C. 2929.11(A).   The court must "consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both."   *Id.*   R.C. 2929.11(B) further provides that "[a] sentence imposed for a felony shall be reasonably calculated to achieve the three overriding purposes of felony sentencing * * *, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders."

{¶ 105} R.C. 2929.12(B) sets forth nine factors indicating that an offender's conduct is more serious than conduct normally constituting the offense; R.C. 2929.12(C) sets forth four factors indicating that an offender's conduct is less serious than conduct normally constituting the offense.   R.C. 2929.12(D) and (E) each lists five factors that trial courts are to consider regarding the offender's likelihood of committing future crimes. Finally, R.C. 2929.12(F) requires the sentencing court to consider the offender's military service record, if any.

{¶ 106} In general, it is presumed that prison terms will be served concurrently. R.C. 2929.41(A); *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 16, 23 ("judicial fact-finding is once again required to overcome the statutory presumption in favor of concurrent sentences").   However, after determining the

sentence for a particular crime, a sentencing judge has discretion to order an offender to serve individual counts of a sentence consecutively to each other or to sentences imposed by other courts. R.C. 2929.14(C)(4) permits a trial court to impose consecutive sentences if it finds that (1) consecutive sentencing is necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) any of the following applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶ 107}** The trial court did not order a presentence investigation prior to sentencing. At sentencing, the State requested maximum consecutive sentences for Boyce. It emphasized Boyce's lack of remorse, that the items taken had significant economic and sentimental value, that Boyce was the boss of the criminal enterprise; that

the only way to protect the public was to impose maximum consecutive sentences, that Boyce committed the McCready burglary while at halfway house, and that he was out on bond when he committed the Koehler, Timmons, Haemmerle, and Geil burglaries. The State argued that recidivism was likely. In response, Boyce proclaimed his innocence and argued that the judicial system had failed. The trial court imposed maximum consecutive sentences totaling 70 years in prison.

{¶ 108} Boyce does not claim that his individual sentences were contrary to law, and we conclude that they are not. Each individual sentence is within the authorized statutory range, and the trial court indicated that it had considered the statutory principles and purposes of sentencing as well as the statutory seriousness and recidivism factors. In addition, the trial court made the appropriate findings under R.C. 2929.14(C)(4); the imposition of consecutive sentences also was not contrary to law. The relevant question is whether Boyce's aggregate 70-year sentence was clearly and convincingly unsupported by the record.

{¶ 109} We addressed a lengthy sentence for a serial burglar in *State v. Beverly*. Beverly, who was 23 years old, was convicted of engaging in a pattern of corrupt activity, burglary (eight counts), attempted burglary (two counts), receiving stolen property (five counts), having weapons while under disability, and fleeing and eluding. The trial court imposed an aggregate 66.5-year sentence. On direct appeal, we held that the sentence was an abuse of discretion, reasoning:

> In outlining the reasons for the sentence it imposed, the trial court did not mention Beverly's prior criminal history. Instead, the trial court noted the number of households victimized, the number of people whose

personal property was stolen or damaged, and the loss of a sense of security by his victims, which was compromised as a result of Beverly's crimes. While these considerations were proper, the trial court also sought to justify Beverly's lengthy sentence by noting that law enforcement officers put in "hundreds[,] maybe even thousands[,] of hours of time and effort" spent by law enforcement agencies in investigating and tracking down all of the property stolen, organizing it, and trying to return said property to its rightful owners. We conclude that the amount of police work involved should not have formed a basis to increase Beverly's sentence. The police officers, detectives, and other law enforcement officials involved were performing their respective jobs conducting the investigation, cataloguing, and retrieving the items stolen by Beverly and Imber [Beverly's co-defendant].

Fortunately, none of the victims suffered any physical injury. Although the anger, fear, and disturbances experienced by the victims may properly be considered, there is nothing in the record to suggest that these psychological injuries were qualitatively greater than those predictably experienced by any victim of a burglary, or that the victims are unlikely to overcome these effects within a reasonable period of time. We also note that the lack of a pre-sentence investigation report in a case of this nature makes it harder to fashion a sentence consistent with the statutory sentencing factors and guidelines found in R.C. 2929.11 and 2929.12.

We do not seek to minimize the criminality of Beverly's actions and

the wrong done to his victims. Nevertheless, treating this case as if these crimes were the most serious forms of the offenses, and treating Beverly as if he were the most depraved of offenders, is not supported by the evidence in the record. The imposition of the 66½-year sentence in this case deprecates the validity of similar harsh sentences in those cases that truly merit them. As Justice Lanzinger has written, "[i]t is a rare victim who does not consider the crime committed by an offender to be undeserving of a maximum penalty. * * * It will take a courageous judge not to 'max and stack' every sentence in multiple-count cases." *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, at ¶ 31 (Lanzinger, J., concurring).

Finally, Beverly argues that his co-defendant, Imber, who plead guilty, received a more lenient sentence. Specifically, Imber entered guilty pleas to ten fourth-degree felony offenses and received an aggregate sentence of thirteen and one-half years in prison, less than a quarter of the sentence Beverly received. *State v. Imber*, 2d Dist. Clark No. 11 CA 0063, 2012-Ohio-372. Although there is no information in the record to indicate whether Imber had a prior record, the evidence in the record established that Imber was equally culpable with Beverly regarding the charged offenses. On this record, a disparity of over 50 years suggests the appearance of a trial tax, whereby one reason for Beverly's much harsher sentence was that he exercised his right to a jury trial.

*State v. Beverly*, 2d Dist. Clark No. 2011-CA-64, 2013-Ohio-1365, ¶ 55-58 ("*Beverly I*"), *reversed on other grounds,* 143 Ohio St.3d 258, 2015-Ohio-219, 37 N.E.3d 11.

**{¶ 110}** On remand, the trial court sentenced Beverly to an aggregate 50-year sentence. We affirmed that sentence, initially noting that the abuse-of-discretion standard no longer applied and that we could vacate or modify Beverly's sentence only if we determined, by clear and convincing evidence, that the record did not support his sentence, including the trial court's consecutive-sentence findings, or that his sentence was contrary to law. *State v. Beverly*, 2016-Ohio-8078, 75 N.E.3d 847, ¶ 9-10 (2d Dist.) ("*Beverly II*").

**{¶ 111}** On review, we held that Beverly's individual sentences were not contrary to law, as they each fell within the sentencing range and the trial court had considered the required statutory factors, and that the record amply supported the imposition of a maximum sentence for each offense. We further found that the trial court had made the necessary findings for the imposition of consecutive sentences. Significantly for this case, we also concluded that the record did not clearly and convincing fail to support the imposition of consecutive sentences. We stated:

> * * * After compiling an extensive juvenile record and receiving a six-year prison sentence for burglary, Beverly proceeded to engage in a months-long crime spree that included burglarizing eight houses and attempting to burglarize two more. At sentencing, the State represented that someone was home on at least one of these occasions. Beverly and his co-defendant used stolen vehicles to commit the crimes and were found in possession of stolen property including firearms. While serving time in prison following his convictions, Beverly's behavior has been deplorable. Due to the long-term nature of his criminal activity, the number and nature

of his offenses, and his demonstrated inability or unwillingness to be rehabilitated, the trial court reasonably concluded that consecutive sentences were necessary to protect the public from future crime and to punish Beverly and that consecutive sentences were not disproportionate to the seriousness of his conduct and to the danger he poses to the public. The record likewise supports the trial court's finding under R.C. 2929.14(C)(4)(c) that Beverly's history of criminal conduct demonstrates the necessity of consecutive sentences to protect the public from future crime by him.   In light of that determination, we need not address the trial court's additional alternative finding under R.C. 2929.14(C)(4)(b), which was unnecessary.

Although Beverly's aggregate prison term is undeniably harsh — and likely harsher than this court would have imposed — we have no basis to conclude that the consecutive sentences the trial court imposed are clearly and convincingly unsupported by the record, which is the applicable standard of review.   Under this "extremely deferential" standard, we simply are not permitted to substitute our judgment for that of the trial court.

(Citation omitted.) *Beverly II* at ¶ 18-19.

**{¶ 112}** Here, the record reflects that Boyce has been involved in burglaries since 2005.   Boyce was convicted in 2005 and twice in 2008, which resulted in his imprisonment until early 2016.   While in prison, Boyce presented himself as a criminal mastermind and conspired with Burkhart to engage in burglaries together upon their release.   After his release from prison, Boyce was returned to prison to complete his

sentence (May 6 to July 24, 2016). For the rest of 2016 and the first half of 2017, Boyce engaged in a burglary spree, scouting homes for when the occupants would be absent (although the Shells' house/dog-sitter apparently was present for that burglary), entering at night, and taking high-value items from the homes. As noted by the State, Boyce engaged in this behavior while residing at a halfway house after his release from a prior conviction and while on bond for the new charges out of Columbus. The trial record further made clear that Boyce was the "boss" of the criminal enterprise, enlisting several others to sell the stolen items at various pawn shops and jewelers.

{¶ 113} Boyce notes that restitution in this case was "just over $3,000." This amount represented the amounts paid by the Ahmeds and the Koehler to buy their respective items back out of pawn.

{¶ 114} The trial record reveals, however, that the value of the property stolen by Boyce well exceeded the restitution imposed. The 18 complainants for the 2016-2017 burglaries testified to theft of numerous pieces of gold jewelry, jewelry with gemstones, sterling silver flatware and other silver pieces, coin collections, foreign currency, watches, and stamps; many items were unique and family heirlooms. Many victims noted that their "costume" jewelry was not taken and that the stolen items had high monetary values. Nancy McGregor, for example, testified that she had several pieces valued over $10,000 that were stolen; she valued her husband's grandmother's ring, alone, at $20,972; Boyce also stole $3,000 to $4,000 in cash from her. Among her stolen items, Donna Field described a ring with a $2 gold piece, which she testified was rare and valuable; she indicated that the total value of her stolen items was between $80,000 and $100,000. Tamara Compton testified to the theft of $8,200 cash, along with her valuable jewelry,

and Donna Dolbeer indicated that $2,000 in cash was stolen, along with jewelry, a coin collection, and a camera.

{¶ 115} The jury found that the State had established each of the predicate acts alleged for Count 25 (engaging in a pattern of corrupt activity).   The jury thus found that:

- Alyshia Cook sold property in the amount of approximately $5,210.03 to Buckeye Gold between August 14 and December 13, 2016 (predicate act 10)

- Cook sold property in the amount of $6,702.03 to Dash to Cash Pawn Shop and Allen's Coin between January 6 and March 30, 2017 (predicate act 11)

- Quiana Boyce sold $3,000 worth of property at Buckeye Gold on November 30, 2016 (predicate act 12)

- Shaqueeta Terrell sold approximately $4,155 of property to Buckeye Gold between August 29 and November 16, 2016 (predicate act 13)

- Terrell sold approximately $14,388.14 of property to Allen's Coin between January 10 and March 22, 2017 (predicate act 14)

- Boyce took Nored to Allen's Coin to sell approximately $3,104.06 of property on June 19 2017 (predicate act 15)

Those sales totaled more than $36,000.

{¶ 116} Boyce denied culpability for any of the 2016 and 2017 burglaries, and he expressed no remorse for his actions.

{¶ 117} The trial court's aggregate 70-year sentence is severe, amounting to a life sentence for Boyce, who was 33 years old at sentencing.  However, with the record before us, the trial court's sentence is not clearly and convincingly unsupported by the record.   Boyce had prior convictions relating to similar offenses and had previously

served prisons terms for that conduct. He continued to commit burglaries while he was out on bond. Through his conduct underlying this case, Boyce demonstrated an unwillingness to be rehabilitated and a high likelihood of recidivism. Moreover, the offenses stemmed from the burglaries of 18 different homes between 2016 and July 2017, performed with almost systematic precision by Boyce, and the predicate acts for engaging in corrupt activity involved additional criminal activity. There is little doubt that Boyce was the head of the alleged criminal enterprise.

{¶ 118} On this record, Boyce's challenge to his aggregate 70-year sentence is without merit under Ohio's current sentencing jurisprudence.

{¶ 119} Although not specifically raised as an assignment of error, we conclude, however, that the trial court's sentence on Count 19 was clearly and convincingly unsupported by the record.

{¶ 120} The trial court, orally and in its judgment, imposed a one-year sentence on Count 19, which concerned one of Boyce's co-defendants, Quiana Boyce, only. The court ordered the sentences for felony receiving stolen property to be served consecutively, for a total of four years. On May 29, 2018, in an effort to correct the error, the trial court filed an amended judgment, striking the one-year sentence on Count 19 and amending the first full paragraph on page five to read, "IT IS FURTHER ORDERED that all felony receiving stolen property offenses *(Counts 2, 16, and 24)* run consecutively to one another for a total of three (3) years OSP." (Emphasis sic.)

{¶ 121} A trial court generally lacks jurisdiction to modify its own valid final judgment in a criminal case. *See, e.g., State v. Baker*, 2d Dist. Greene No. 2017-CA-55, 2018-Ohio-1865, ¶ 21; *State v. Plemons*, 2d Dist. Montgomery Nos. 26434, 26435, 26436

& 26437, 2015-Ohio-2879, ¶ 21. Under Crim.R. 36, "[c]lerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission, may be corrected by the court at any time." " 'Corrections are proper to make the record reflect what the court actually decided and not what the court might or should have decided or what the court intended to decide.' " (Citations omitted.) *Baker* at ¶ 16, quoting *State v. Burton*, 12th Dist. Clermont No. CA2013-09-071, 2014-Ohio-1692, ¶ 14.

{¶ 122} In this case, the trial court's inclusion of Count 19 in its sentence did not constitute a "clerical error." Nevertheless, we agree that its inclusion in Boyce's sentence was improper. Boyce was not charged with or found guilty of committing Count 19. Accordingly, the sentence for Count 19 will be vacated, and the matter will be remanded for the limited purpose of the filing of an amended judgment entry. We note that the trial court's error as to Count 19 had no effect on Boyce's aggregate sentence.

## V. Conclusion

{¶ 123} The trial court's sentence on Count 19 will be vacated, and the matter will be remanded for the filing of an amended judgment entry. In all other respects, the trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and HALL, J., concur.

Copies sent to:

John M. Lintz
Craig M. Jaquith
Hon. Douglas M. Rastatter